**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Chaim Lowenstein,

      Plaintiff,

v.

Tom Kane, Jr. and
Dietz-Kane & Associates Insurance
Agency, Inc.,

      Defendants.

CIVIL NO.: 10-CV-02857-SRN-AJB

**DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT**

---

## INTRODUCTION

Defendants Tom Kane, Jr. ("Kane") and Dietz-Kane & Associates Insurance Agency,

Inc. ("Dietz-Kane"), submit this Memorandum in opposition to Plaintiff's Motion for Summary

Judgment.

Plaintiff's motion should fail in all respects.

## STATEMENT OF FACTS

Defendants adopt their Statement of Facts contained in their motion for summary

judgment, and their Answers and Counterclaims in this action for purposes of this motion in

opposition.

## ARGUMENT

Defendants will present their opposition by rebutting Plaintiff's arguments as organized

in Plaintiff's memorandum of law.

# I.      Summary Judgment Standard

To the extent that Plaintiff discusses the standards for summary judgment in Section I of his memorandum, Defendants agree that the standards reflected in the cases cited by Plaintiff are instructive in regard to a trademark and/or copyright infringement case.

To the extent that Plaintiff includes alleged facts in Section I, Defendants comment as follows.  In the first full paragraph of this section, Plaintiff includes two alleged statements of fact. The first is the assertion that Plaintiff is the owner of several trademarks and a copyright [in connection with his alleged coffee businesses]. Defendants have not attempted to prove or disprove this assertion, because the veracity of Plaintiff's claim of ownership does not matter in the context of this case.

It is Plaintiff's second alleged fact that goes to the very heart of this case. Plaintiff erroneously states that: "It is not seriously in dispute that *Lowenstein had an account with GoDaddy* which controlled web hosting, email and domains names and that Kane gained access or control to that account." (emphasis added). This statement must be viewed in conjunction with the second sentence, of the second paragraph of Plaintiff's Statement of Facts, wherein Plaintiff correctly states that Kane took control of *ArmorCore's website at GoDaddy* and that ArmorCore's website contained Plaintiff's websites (and consequently his alleged marks residing within Plaintiff's websites)(emphasis added).     So it is very much in dispute that Lowenstein had an account with GoDaddy.  Plaintiff can't have it both ways.  Either Plaintiff owns the account at GoDaddy or ArmorCore owns the account.

The actual facts are that the GoDaddy (aka Blue Razor) web hosting contract is in the name of and belongs to ArmorCore. ArmorCore assets were used to purchase the account. Plaintiff used an American Express card with ArmorCore's and Kane's name on it to purchase web hosting for his domain names. Examples of the AMEX card showing Kane's name; ArmorCore's address in St. Paul, MN; a charge to Blue Razor; and a Blue Razor Domains, Inc. receipt for the purchase several of Plaintiff's domain names also showing ArmorCore's address in St. Paul and Kane's name is provided for the Court's review. (Aff. of Okoneski, Exhibit #1).

Plaintiff is the person who set up the ArmorCore account at GoDaddy! Plaintiff's coffee business websites were not originally resident within the ArmorCore account at GoDaddy. Plaintiff is the one who later placed his coffee business websites within ArmorCore's account at GoDaddy. One might ask why Plaintiff put his coffee business websites under the ArmorCore contract at GoDaddy.  One might ask what Plaintiff's alleged coffee businesses have to do with ArmorCore's business of electronic data storage and recovery.  Well, Kane has asked, and in connection therewith has made his business related counterclaims against Lowenstein.

Plaintiff and Kane own ArmorCore together (50/50). Kane had just as much right to "control" (by way of becoming administrator of the account for ArmorCore as per GoDaddy's contractual terms) ArmorCore's account at GoDaddy as Plaintiff did. Not only did Kane have the right as partner in ArmorCore to become administrator of ArmorCore's account at GoDaddy, Kane had the justifiable need to take control of the account. Kane had a legitimate need to become administrator of the account to investigate and substantiate his suspicions that Lowenstein was involved in criminal activities that might implicate ArmorCore and himself. As the Court knows from Defendants' motions, this unfortunately and ultimately came true.

Kane had the need, as a business partner, to determine why and how Plaintiff was using ArmorCore assets to promote his alleged coffee business. On the heels of Kane beginning his own investigations, and while entertaining threats of trademark infringement and copyright suit by Plaintiff as a result of becoming administrator of ArmorCore's account at GoDaddy,   Kane was accused by the United States Postal Inspection Services of being complicit in Plaintiff's illegal activities.  In order to exculpate himself Kane had to convince the investigator that his business partner was acting alone in his rebate scam, agreed not to have any further communications with Lowenstein, and agreed to not allow Lowenstein to have access to ArmorCore's account at GoDaddy, because Lowenstein had used ArmorCore's email addresses to fraudulently obtain rebates and preservation of this evidence was important to the United States' case.   All of these facts are discussed and supported at length in Defendants' own motion for judgment on the pleadings in this case.  In the interests of brevity and to avoid redundancy, Defendants respectfully request that the Court read and consider their coordinate motion for judgment on the pleadings together with this memorandum in opposition to Plaintiff's motion.

As argued in Defendants' motion, this case is truly about claims partners in ArmorCore may have against each other for breach of fiduciary duty, recovery of invested capital, corporate dissolution, and perhaps who had the right to be the administrator of ArmorCore's web hosting account at GoDaddy.  For his own illegitimate purposes, Plaintiff pretends that this is a trademark and copyright infringement case.  Reading Plaintiff's and Defendants' motions together, it is clear that not only are there no uncontested facts, but there are no facts at all asserted by Plaintiff that would support any claim for trademark or copyright infringement. These are the only claims Plaintiff has plead in this case.  Therefore, as the standards recited by Plaintiff provide, summary judgment in favor of Plaintiff would be manifestly inappropriate.

**II.      Defendant (presumably Kane) has not transferred and/or used Plaintiff's
domain names for his own benefit. Thus, there can be no infringement.**

A. **Anti-Cybersquatting Consumer Protection Act**.

There is no Anti-Cybersquatting claim in the record.  Therefore, the Court should not

consider any argument of Plaintiff on this theory.

The Complaint in this case does not contain a Count for Anti-Cybersquatting [Docket No.

1]. Fed. R. Civ. P. 15 provided Plaintiff a number of opportunities, as matter of course, to amend

his Complaint or his Reply to Defendants' pleadings to include such a Count, but Plaintiff did

not.  After the expiration of the various 21 day periods described in Rule 15(a)(1)(A) and (B), a

party may only amend its pleadings with the opposing party's written consent or the court's

leave. Fed. R. Civ. P 15(a)(2). The Court's Pretrial Scheduling Order established January 1, 2011

as the deadline for the service of motions which seek to amend the pleadings. [Docket No. 19].

Plaintiff did not receive from Defendants the required consent to amend his pleadings to include

a Count for Anti-Cybersquatting.  Plaintiff did not bring a motion before the court to request

leave to so amend.

Nevertheless, Plaintiff filed his Amended Complaint containing a Count for Anti-

Cybersquatting on December 31, 2010 [Docket No. 30 at Count VI].  Defendants' objected to

Plaintiff's counsel about the attempted amendment to the complaint at various times and advised

that Plaintiff had no Anti-Cybersquatting claim in the record.  (Aff. of Okoneski, Exhibit #2).

Despite the Rules, the Court's Pretrial Scheduling Order, being put on notice by Defendants'

counsel,  and the passing of  nine months after the deadline to bring a motion to amend the

Complaint, Plaintiff devotes about one-half of his motion for summary judgment to arguing his case for relief on a claim that is not even in the record.  It would be unjust for Defendants to have to defend a claim that is not in the record.  Based upon the forgoing, the Court should rule that Plaintiff cannot maintain any claim based on Anti-Cybersquatting (15 U.S.C. 1125).

Even if the Court were to consider allowing Plaintiff leave to amend his complaint to include a claim for Anti-Cybersquatting at this point in the proceedings, such an amendment would be futile. As will be shown herein, Defendants did not register the domain names, took no actions in bad faith and, in any event, fall within the protection of the "safe harbor" exception to any Anti-Cyber-Squatting claim.

Before addressing Plaintiff's legal arguments, Defendants are compelled to point out to the Court that Plaintiff has taken much liberty in baldly inserting unsubstantiated and untrue statements of fact beginning in the last paragraph of page 4 of his memorandum and continuing on through page 6.  The first of these is Plaintiff's assertion that Defendants have intended to "profit" or "benefit financially" by using Plaintiff's domain names. There is no evidence in the record, or even alleged in the Complaint, that Defendants have ever sold or attempted to a sell a single coffee bean or Plaintiff's domain names.   The second is that Defendants have "diverted" consumers from Plaintiff's websites. There is no evidence in the record, or even alleged in the Complaint, to the effect that if a consumer tried to view Plaintiff's website they would be "diverted" to any other website, similar or otherwise. Plaintiff and his counsel know full well that Plaintiff's websites are down and inaccessible to anybody.   Finally, that Kane gave "misleading" information to GoDaddy to become administrator of ArmorCore's account. Plaintiff and his counsel know full well that GoDaddy only allowed Kane to become the administrator of ArmorCore's account because the domain names, including Plaintiff's (which

he registered with GoDaddy himself) were purchased with an American Express credit card in the name of ArmorCore and Kane. This is the same credit card that Plaintiff fraudulently obtained in Kane's name, used to pay for his coffee related domain names, and placed on file in GoDaddy's records. So, in reality, GoDaddy relied on information supplied by Plaintiff, not Kane, when it allowed Kane to become administrator of ArmorCore's account! Much of the above will be revisited in discussing Plaintiff's legal arguments below.

### 1.   Plaintiff's Ownership of Distinctive Marks.

Plaintiff did not attach to his Complaint any prima facie evidence of his registration of any of his alleged trademarks.   It would be customary to attach a copy of the actual registration of the marks to the Complaint as an exhibit. Regardless, Defendants do not need to disprove Plaintiff's allegation of ownership of the marks in order to prevail in this action.  Defendants reserve the right to put Plaintiff to the strict proof of his ownership of the marks, if this matter proceeds to trial and the issue becomes material.

### 2.   Plaintiff's Assertion of Defendants' Transfer of the Domain Names and Bad Faith.

Plaintiff's assertion that Kane transferred his domain names is misguided and untrue. Kane never transferred anything. The only "transfer" of Plaintiff's domain names occurred when Plaintiff transferred them into ArmorCore's account with GoDaddy.  Plaintiff turned his domain names into assets of ArmorCore, or at the very least put them within the administrative control of ArmorCore, the moment he used ArmorCore's credit to pay for their hosting in ArmorCore's

account with GoDaddy.  Plaintiff's comingling of his personal assets (i.e. his domain names, amongst numerous personal expenses and unauthorized ArmorCore expenditures for his own personal benefit) are at the very heart of Kane's business related claims against Plaintiff.   Kane merely become ArmorCore's administrator of its web hosting account at GoDaddy which, as we have seen, he certainly had the right and reason to do.  Namely, to investigate Plaintiff's breach of fiduciary duties as a member of ArmorCore, Plaintiff's use of ArmorCore as a conduit for his illegal activities,  and in self-defense of the United States' intent to arrest him as an accomplice to Plaintiff's mail fraud activities.

Plaintiff's real complaint is that he is no longer the administrator of ArmorCore's account at GoDaddy.  Defendants are not aware of any statute or line of cases that would turn a question of which member of a LLC might be entitled to be the administrator of a web hosting account into a cause of action for Cybersquatting, or trademark and copyright infringement for that matter.   Perhaps Plaintiff should have asked a Court to reinstall him as ArmorCore's administrator of the account. That would make much more sense than pretending Kane "transferred" Plaintiff's domain names to himself. Plaintiff's domain names are right where he put them – in ArmorCore's account and administered by a member of ArmorCore.  Kane's legitimate administrative control of ArmorCore's web hosting account is a business matter and not a "transfer" of any domain name, especially in the sense the term "transfer" is used in Cyber-Squatting cases.

Plaintiff cites *DSTP Intern., Inc. v. Naham*, 624 F. 3d 1213 (9th Cir. 2010) for the proposition that use of a domain name to gain an advantage in business negotiations can be considered bad faith, when the domain name registrant has no legitimate rights to the marks incorporated in the domain name.  The instant case is easily distinguishable. In *DSTP,* Naham

was trying to collect a commission he was owed by DSTP.  For leverage, Naham purposefully caused Plaintiff's website to completely disappear.  If a DSTP customer typed DSTP's domain name into their web browser, they were directed to contact Naham. Of course, this was an obvious attempt by Naham to ransom DSTP's website for cash and the court found that Naham had acted in bad faith.  It didn't help Naham that DSTP had asked numerous times for him to return their domain names and Naham refused.

In this case, Kane's becoming administrator of ArmorCore's account did not change anybody's ability to view Plaintiff's websites. If someone typed in the domain name they were used to using to view Plaintiff's web sites, they would see exactly what they always saw and would have access to the same information they always had access to.  Kane's administrative rights to ArmorCore's account did not direct or divert any customers to any other site, and certainly not to one owned by Kane. In addition and unlike Naham, before the United States asked Kane not to, Kane and GoDaddy tried several times to assist Plaintiff to transfer his domain names out of ArmorCore's account to wherever Plaintiff wished to have them transferred, just so that both Kane and GoDaddy could be rid of Plaintiff's threat of trademark and copyright claims.  In short, Plaintiff failed and refused to join in several prearranged conference calls for this purpose.  Kane's efforts to get Plaintiff's domain names out of ArmorCore's web hosting account and into the control of Plaintiff is hardly the stuff that bad faith is made of.  In fact, just the opposite is true.  It is Kane's belief that Plaintiff failed to cooperate with he and GoDaddy precisely so Plaintiff could bring this frivolous action against him.

Plaintiff's last argument regarding bad faith is that Plaintiff's and Kane's business disputes should allow the Court to "infer" that Kane intended to use Plaintiff's domain names as

9

leverage in negotiations.  Inferences are a subject matter for juries to consider.  A court considering summary judgment must view the facts in a light most favorable to the non-moving party.    In this case Kane did not demand $5,000 from Plaintiff for the return of domain names, as Plaintiff would have the Court believe.

The email marked as Exhibit 12 to Plaintiff's memorandum and purportedly from Kane to Plaintiff is an obvious fake.  It is apparent from the varying type faces in the email that the document was a "cut and paste" job. Kane is on the record as stating that the email is a forgery and denies sending it.  We should keep in mind that Plaintiff is a twice convicted felon and just recently admitted guilt to the very mail fraud charges (rebate scams) that led Kane to become ArmorCore's administrator of its web hosting account at GoDaddy. Part of Plaintiffs mail fraud scam included duping manufacturers into thinking that they were dealing with ArmorCore. Plaintiff is very good at manipulating emails to represent something they are not.

For illustrative purposes, in Aff. of Okoneski, Exhibit #3,  there  is an example of an email which plaintiff faked.   Apparently, the easiest part of an email to trick people with is the notation about who the sender is.  This email says it is from "tom@armor247.com". The person who received it was Brian Goodman.  Goodman did not believe Kane would send such an email, so he forwarded the original to Kane.  This is helpful, because you can only trace an email from its original electronic form and not from a printed out version.  With the help of an experienced IT person, Kane was able to learn that this email came from an IP address of 69.112.189.105. This IP address is found near Brooklyn, New York.  Plaintiff lives in this area. Kane has never been to Brooklyn. Kane believes that the Goodman email was sent by Plaintiff as part of his plan to set up Kane. (Kane Depo. at 20-22) .

Of course, Kane can't prove that Plaintiff's exhibit 12 is forgery by Lowenstein, because we do not have the original electronic version of the email to work with. But, Kane denies he is the author of the email. In fact, Kane is certain, that after about June or early July of 2008, he completely stopped using the email address of tom@armor247.com and began using only tk-jr@popp.net he suspicious that Lowenstein might be able to view his emails.  Kane also is certain that the email is forged, because the email is dated August 17, 2008 and by that time Kane had already promised the United States Postal Inspection investigator that he would have no further contact with Lowenstein.

The same situation occurs in the email attached to Ms. Raynor's Affidavit.  (Exhibit 1 to Plaintiff's memorandum).   This email is dated August 22, 2008 which is far past the time that Kane stopped using tom@armor247.com to communicate with anyone. Even more disconcerting, is that in her Affidavit, Ms. Raynor states that she received the attached email from Tom Kane.  How can this be? The name "Kane" does not appear anywhere in the email and in her forwarding email to Plaintiff she states she has "no idea who this guy is".  Ms. Raynor also states in her Affidavit that she received a call from someone who identified himself as Tom Kane.  The call could have come from anyone or no one.  We don't even know that the Raynor Affidavit is from Raynor.  The signature on the Affidavit is not authenticated.  The Court should also find suspect that Dietz-Kane, a long established insurance agency in St. Paul, MN, would represent to anyone that it was getting into the business of being a coffee supplier. Kane does not know, has never met, has never called or spoken to, and has never emailed Ms. Raynor.  Kane believes that Plaintiff fabricated the Raynor email in an effort to set-up Dietz-Kane for inclusion in the trademark and copyright lawsuit Plaintiff had threatened because of Kane becoming ArmorCore's administrator of the web hosting account at GoDaddy

Given the ease with which Plaintiff can manipulate emails for his own purposes and his history of doing so, Defendants urge the Court to regard any electronically created documents offered by Plaintiff in this case to be suspect.

Plaintiff's last full sentence on page 7 of his memorandum is: "While Kane claims that the email is a forgery and denies sending it, he does not completely deny having made similar demands of Plaintiff".   In his previous sentence, Plaintiff says that Kane demanded $5000.00 for the return of the domain names.  By joining these two sentences, Plaintiff attempts to lead the Court to believe that Kane has made similar demands for money from Plaintiff in return for the release of domain names.  Kane has never "ransomed" domain names.  Kane believes that the $5,000 figure Plaintiff inserted into the fake email comes from the approximate $5,700 balance on the American Express credit card which Plaintiff fraudulently obtained in Kane's and ArmorCore's name. Kane had argued with Lowenstein about the balance on that credit card, because American Express was trying to collect from Kane all the charges Plaintiff put on the card for his own personal benefit and because ArmorCore shouldn't have to pay for Plaintiff's personal expenses either.

Congress designed the Anti-Cybersquatting statute to "target a narrow class of cyber-squatters consisting of those who have the bad faith intent to profit, and not to tread on the rights of those with any other motives." *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 370 (D.N.J. 2004).  When considering what might constitute a bad faith intent to profit, the Court is given the nine non-exclusive factors described in 15 U.S.C. § 1125(d)(1)(B)(i) as guidelines. (The relevant text is laid out for the Court on page 5 of Plaintiff's memorandum). But these guidelines are not exclusive.  These factors are "given to courts as a guide, not as a substitute for careful thinking" about the ultimate issue in a cybersquatting claim – "whether the conduct at

issue in motivated by a bad faith intent to profit." *Lucas Nursery & Landscaping*, *Inc. v. Grosse,* 359 F. 3d 806, 811 (6th Cir. 2004). Moreover, the factors "should be examined in tandem with the 'safe harbor' in the ACPA which provides that bad faith intent shall 'not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was …lawful." *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d at 369 (quoting 15 U.S.C. § 1125(d)(1)(B)(ii)).

Kane has acted lawfully and reasonably with respect to Plaintiff's domain names at all times. Kane had reason to believe that Plaintiff, his partner in ArmorCore, was involved in illegal activities which involved ArmorCore's email accounts hosted at GoDaddy. To investigate and to protect ArmorCore from Plaintiff's suspected illegal activities Kane wanted to become the administrator of ArmorCore's account so he could view and preserve the company's email records. Kane was only able to become administrator by proving to GoDaddy that he had the legal right to so. During this process Kane was surprised to learn that there were numerous domains related to Plaintiff's coffee business within ArmorCore's account. Without Kane's knowledge and by using company assets Plaintiff had transferred his coffee related domain names into the administrative control of ArmorCore.

When Kane learned that his becoming administrator of ArmorCore's account meant that he effectively had control of Plaintiff's coffee related domain names, he immediately began working with GoDaddy and Plaintiff to try to keep administrative control of ArmorCore's domain names, but return control of the coffee related domain names to Plaintiff. This was despite the fact that Plaintiff had sworn out a complaint with the St. Paul police accusing Kane of "stealing" his domain names. (Aff. of Okoneski, Exhibit 4).

Because there was on ongoing dispute between the ArmorCore partners about who had the right to administer ArmorCore's account, there was a period of a few weeks where GoDaddy locked the account down so neither could administer it.  Eventually, GoDaddy set Kane up as administrator because the domain names had been paid for using a credit card in ArmorCore's and Kane's name.  This is the AMEX Card that Plaintiff fraudulently obtained in Kane's name and charged over $5,000 of personal expenses to, including his coffee business domain names.  So -  it was at Plaintiff's own fraudulent hand that Kane unwittingly became the administrator of Plaintiff's domain names.

It was during the GoDaddy imposed 'lock-down" period that the United States Postal Inspection Services visited Kane at ArmorCore's St. Paul business address and threatened to arrest him as an accomplice to Plaintiff's illegal rebate and mail fraud  activities.  This episode and Kane's ultimate, and thankfully, successful efforts to exonerate himself are described in Defendants' motion for judgment on the pleadings.  The cooperation that Kane promised the United States in its effort to indict and convict Plaintiff of mail fraud included an agreement not to communicate with Plaintiff and to not allow Plaintiff access to ArmorCore's web hosting account. Therefore, since the fall of 2008, when GoDaddy made Kane the sole administrator of ArmorCore's account, Kane has not had any contact with Plaintiff and Plaintiff's domain names remained within ArmorCore's control, or have lapsed. Unbelievably, Plaintiff argues that these circumstances are sufficient for the Court to determine that Kane is a bad-faith cyber-squatter as matter of summary judgment.

Plaintiff cannot show that Kane "transferred" his coffee related domain names anywhere, much less to himself. The only transfer that took place was when Plaintiff transferred his own domain names into the ArmorCore account. Becoming an authorized administrator of

ArmorCore's web hosting account at GoDaddy hardly constitutes cyber-squatting.  Plaintiff makes much of the fact that Kane is now listed as the "registrant" of his coffee domain names within the ArmorCore account.  But this argument is merely semantics over substance and flies in the face of common sense.  GoDaddy artificially designates whoever is the administrator of the account as "registrant ".  Kane never claimed to be a registrant nor did he ever maintain that he had any legal rights to the coffee domain names. They were simply in the account, wrongfully and at Plaintiff's hand of course, when Kane became administrator.

Plaintiff cannot show that Kane acted in bad faith with intent to profit.  Kane did not hijack Plaintiff's coffee domain names and divert web traffic to himself, as Naham did in the *DSTP* case.  The domain names remained viewable to everyone and the content was exactly the same as when Plaintiff registered them first on his own nickel and then later when he used ArmorCore's and Kane's credit (albeit fraudulently) to register them in ArmorCore's account. The email containing the $5,000 demand is a fraud.  Kane states that he did not send it and the Court must take him at his word for purposes of summary judgment.  Additionally, Kane has explained how easy it is to doctor an email and has shown that Plaintiff forged the Goodman email.

As a final point in this cybersquatting discussion, even if the Court is inclined to consider whether Kane "used" Plaintiff's domain names in the sense that term is interpreted  in cybersquatting cases, Kane would be saved by the "safe harbor" provision of 15 U.S.C. §1125(d)(1)(B).  The safe harbor provisions allow a party the "fair use" of a domain name or such a use as is otherwise lawful.  Becoming the administrator of the ArmorCore account wherein Plaintiffs' domain names resided was lawful.  Investigating Plaintiff's use of the ArmorCore credit card for his own personal benefit was lawful, especially when Plaintiff set the

card up so that Kane would be personally liable for Plaintiff's personal charges, including the payment of the hosting fees for the very coffee domain names at issue in this case.  Investigating Plaintiff's suspected illegal activities through the use of the domain names residing in ArmorCore's account would certainly be a  lawful and fair use. Defending oneself from arrest and indictment by the United States for mail fraud is likely to strike just about everybody as the ultimate "fair use" of a domain name.  This is even more true in this case, because the domain names are owned by the person implicating Kane in the mail fraud.

Based upon the forgoing the Court should refuse to consider Plaintiff's attempt to include a count for Anti-Cybersquatting because there is no such count in the record and, if need be, because the inclusion of such a count would be futile.

**B.  Plaintiff's Assertion That Kane Is Infringing His Marks Contained in Domain Names by Diverting Customers.**

We have previously shown that Kane has not "registered" any domain names.  When Kane became administrator of ArmorCore's web account, Plaintiff's domain names stayed in the same ArmorCore's account where Plaintiff put them.  Kane did not benefit financially in any way.  Plaintiff has not provided a single instance of Defendants receiving any financial benefit whatsoever from any of Plaintiff's domain names. Not an invoice, sales receipt, a statement from a lost customer, etc.   A mere conclusory statement such a this does not insulate Plaintiff's complaint from dismissal under Rule 12 (b)(6) when there are no facts even mentioned in the complaint or appearing elsewhere in the record to support the legal conclusion, much less allow for summary judgment.

16

Plaintiff asserts that Defendants are using not only similar, but Plaintiff's identical domain names to further their business interests.  Plaintiff neglects to educate the Court as to how Defendants could possibly further their insurance business by advertising coffee products.  Even if Plaintiff means the electronic data storage and recovery business of ArmorCore, the coffee connection is absurd.

The Court may recall from the discussion above, that it is impossible for Defendants to confuse any potential coffee purchaser.   Any person typing in one of Plaintiff's domain names would see the exact information that Plaintiff placed there when Plaintiff first registered the domain names. The domain names, web sites, and marks contained within web sites, were all left exactly as they were before Kane became administrator of ArmorCore's account at GoDaddy.  Consumers were not diverted or mislead in any way.  Consumers could only view exactly what Plaintiff put there in the first place.

Plaintiff's cite of *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F. 3d 1036 (9th Cir. 1999) is utterly without relevance.  *Brookfield* is about metatags.  Metatags are basically keywords that search engines recognize and then use to direct internet traffic accordingly.  For example, if someone searched " soda, coke, diet" ( assuming that "coke" is a registered mark) and were diverted to a Pepsi website, some lawyers would become very busy. There is nothing in this case that has anything to do with confusing consumers by diverting their searches.

Plaintiff has the burden of proof to show that Kane was and is displaying Plaintiff's websites if Plaintiff wants to argue that they contain his marks or that consumers are being diverted.   Plaintiff has not attached any screen shots of any of his websites to the complaint or as

an exhibit to his motion.   He cannot do so because Plaintiff's sites are down and have been down for some time.

### C.  Plaintiff's Argument That Kane Is Not Entitled to Hold Plaintiff's Domain Names.

Plaintiff argues that as a matter of policy there is no plausible reason to allow Kane to keep Plaintiff's domain names from him.  As discussed above, initially Kane had every plausible reason to keep administrative control of Plaintiff's domain names that resided in ArmorCore's account, the most critical of which was self-defense with respect to the mail fraud claims by the United States that Plaintiff implicated him in. Kane's continued administrative control at the request of the United States.    But the point has been made moot.  Some of Plaintiffs domain names are believed to be still locked down at GoDaddy and some have been available for sale for some time. Plaintiff could have purchased theses at any time.

### III.    Plaintiff's Argument That Defendants Infringed His Copyrights by Controlling The Webhosting Account.

#### A.  Plaintiff Owns Copyright Registrations in the Websites.

Defendants have no opinion on the ownership or validity of Plaintiff's registration of the website at www.247coffee.com.

**B.   That Defendants Have Infringed Plaintiff's Exclusive Right To Publically Display Plaintiff's Website.**

Plaintiff's above heading refers to "Defendants", but his argument is restricted to Kane alone, without any reference, connection, or explanation of how Defendant Dietz-Kane might have infringed any right Plaintiff claims.  Therefore, it is presumed that no discussion regarding Dietz-Kane is required in response to Plaintiff's argument.

Plaintiff's infringement argument fails because he granted ArmorCore the right to display his website.  Plaintiff wrongfully, but purposely, placed his website within the control of ArmorCore with the intent that ArmorCore display his website.  Plaintiff was the administrator of ArmorCore's domain names at that time and he followed through on his intent by causing ArmorCore to display his websites, copyrighted work included.  The effect of this is that Plaintiff consented to and authorized ArmorCore to display his copyrighted works.  As proof of Plaintiff's consent, the Court can take judicial notice that Plaintiff did not sue ArmorCore for infringement of his copyrighted works at the time. Why would he?  He had accomplished the publication of his own personal website, for his own personal benefit, and all at the expense of ArmorCore and Kane.

After Kane became administrator of ArmorCore's domain names, Plaintiff's website remained displayed through ArmorCore's account at GoDaddy for a period of time. Plaintiff cannot reasonably argue that ArmorCore's display of his website was a non-infringing event while he was ArmorCore's domain name administrator, but suddenly became infringing merely because Kane became administrator.

Kane denies that he caused ArmorCore to take Plaintiff's website(s) offline periodically and at his discretion and there is no evidence in the record to substantiate this assertion.  In fact,

Kane doesn't know how to do that.  Kane has never manipulated any website residing within the ArmorCore account.  Since Kane became administrator of ArmorCore's accounts at GoDaddy the contents have been left there unmolested.   To Kane's knowledge, the only time any website was offline was when GoDaddy shut down the entire account for a week or two while they were investigating Plaintiff's accusations that Kane stole his domain names.

Even absent the above argument that any display by ArmorCore of Plaintiff's website was with his consent, Plaintiff's copyright infringement claim fails for purposes of summary judgment.   Plaintiff has placed no evidence in the record to show that Plaintiff's website was displayed or that it incorporated his copyrighted works.  The only evidence now in the record is that Plaintiff's website is down and not viewable. (Aff of Okoneski, Exhibit #5).


### C.  Plaintiff's Argument That Defendants Actions Are Without Justification.

This argument is merely a continuation of Plaintiff's red herring copyright infringement claim. As stated above, Plaintiff's copyrighted works appeared in Plaintiff's own website which he not only allowed, but also caused ArmorCore to display.   Plaintiff's primary argument seems to be that when his website was displayed by ArmorCore when he was in charge, that was fine with him and he never gave a thought to copyright infringement claims.  But, when the same website was displayed by ArmorCore when Kane was in charge, his first thought was to sue Kane for copyright infringement.  This is an absurd position to take.

The assertions Plaintiff makes about Kane's conduct in this section are equally absurd. Kane did not take it upon himself to control *all* of Plaintiff's domain names.  Kane only wanted to control ArmorCore's domain names to investigate Plaintiff's breach of duty to ArmorCore and

Kane, and to investigate his suspicion that Plaintiff was using ArmorCore's domain names and emails in a rebate scam. Kane had no idea Plaintiff's domain names were in ArmorCore's account and it's not Kane's fault that they were. Once discovered, after being accused of stealing them by the police, and being threatened by Plaintiff with this lawsuit, Kane tried to separate Plaintiff's domain names from ArmorCore's and return them to Plaintiff's control. Kane and GoDaddy set up conference calls between the parties to arrange this, but Plaintiff blew the calls off. Nearly contemporaneously, Kane found himself faced with arrest by the United States because of Plaintiff's illegal mail fraud activities he was running through ArmorCore. Kane complied with the Postal Inspector's request to not return control of or let Plaintiff have access to ArmorCore's web hosting account in order to preserve evidence.

Kane suggests to the Court these circumstances can only be read to support Kane's position that it would be impossible for Plaintiff to prove that Kane acted in any intentional or willful to infringe Plaintiff's copyrights.

## IV.   Plaintiff's Argument That Defendants Have Not Pled or Offered Evidence In Support of Their Counterclaims.

### A.  Slander.

Plaintiff was aware that both Kane and Dietz-Kane claimed that Plaintiff had slandered them and had the opportunity to review the slanderous comments prior to bringing this motion.

The *Moreno v. Crookston Times Printing Company Co*, 610 N.W. 2d 322 (Minn. Ct. App. 2000) cited by Plaintiff does state that, generally, the defamatory matter should be set out

verbatim.   But the same Court also recognized that if not, the general rules of pleading only require a short and plain statement of the claim showing that the pleader is entitled to relief pursuant to Minn. R. Civ. P. 8.01. (Id at 326,327).

Plaintiff was certainly aware of his need to inquire about the alleged slanderous comments, because Plaintiff's Interrogatory No. 11 to both Defendants requested, amongst other things, the identification of documents supporting each of their counterclaims.  Defendants offered Plaintiff's counsel the opportunity to inspect, audit, copy or summarize all discoverable documents.  This method of discovery is common where there are numerous documents to review and the burden of review is the same for both parties. For whatever reason, Plaintiff's counsel never made arrangements to review the offered documents.

A review would have shown the following:

1.   Email dated July 25, 2008 from Lowenstein to <u>domaindisputes @godaddy.com wherein</u> Lowenstein said that Tom Kane had obtained the last four digits of a company credit card without authorization and used that information in an attempt to change the administrative record, credit card information, the call in [PIN] and customer record at GoDaddy.  (Okoneski Aff., Exhibit #6). The credit card referred to is the AMEX card that Lowenstein had put in Kane's name.  The obvious import of this email is to paint Kane as a credit card thief and as a person who would wrongfully   attempt to gain illegal access to another's domain.

2.   Email dated August 22, 2008 from Annette and forwarding to Plaintiff an email purportedly from <u>tom@amor247.com</u> to her.  (Okoneski Aff., Exhibit # 7). This

is believed to be forged by Plaintiff (as discussed earlier herein) and seeks to paint

Kane and Dietz-Kane as slanderers.

3.  Email dated August 22, 2008 from Overlie to Plaintiff and forwarding another email

painting Kane and Dietz-Kane as slanderers.  This is believed to be another of

Plaintiff's forgeries. (Okoneski Aff., Exhibit #8).

4.  Saint Paul Police Department Original Offense/Incident Report dated July 22, 2008

wherein Lowenstein accuses Kane of hijacking several of his internet domains.  (Okoneski

Aff., Exhibit # 4).

The determination of whether a communication is defamatory is a question of fact for the

court, which applies the test as to whether a reasonable person would believe the statement to

be defamatory. *Anderson v. Kammeier*, 262 N.W. 2d 366, 372 (Minn. 1977). Because these

statements put the question of the honesty Kane and Dietz-Kane in their business affairs, the

court could find them slanderous per se. Id. at 373.

The issue of whether one or more of these statements constitute slander is one for the

court.   Therefore, Defendants request that the court reserve consideration of same for trial.

**B.  Plaintiff's Argument That Defendants Fail To Allege Sufficient Facts To
    Support Their RICO Claims.**

**1.  Pleadings to support Defendants' RICO claims.**

Plaintiff is mistaken in asserting that Defendants' counterclaims do not allege facts that

would indicate how Plaintiff committed the mail fraud which gives rise to their RICO claims.

Defendants present the legal elements required to support a RICO claim in their counterclaims.

The RICO elements are, in turn, supported by the facts contained in the Statement of Facts of the counterclaims. These facts tell the story of Plaintiff's fraudulent activities.

Plaintiff operated a business a business called WebCom247.  (¶ 10 of Kane's CC's). Plaintiff fraudulently represented to manufactures of computer components that WebCom247 was a major builder and seller of computers. (¶ 13 of Kane's CC's).  Plaintiff would convince the manufacturers to send him their components to evaluate whether WebCom247 would use them as supplier in its computer building business. (Id). Plaintiff would then convert the components to cash by selling them on eBay. (Id). Plaintiff ran a ring of about 132 "associates" who helped him in this scheme. (Id).

Plaintiff, through his various businesses (one of which is WebCom247 mentioned above), also ran an illegal scam in which would create false sales records and submit same to manufacturers to obtain rebates. (¶ 42 of Kane's CC's).  Plaintiff used ArmorCore and Dietz-Kane as conduits for receiving the illegal rebates. (Id).  Plaintiff used ArmorCore's domain names to facilitate his illegal rebate scheme. (¶ 46 of Kane's CC's).  In about mid-2008 the United States Postal Inspection Service began investigating Plaintiff for mail fraud in connection with his illegal rebate scams. (¶ 49 of Kane's CC's).  An inspector for the USPS came to Dietz-Kane and met with Kane because it was thought that Defendants were involved in Plaintiff's illegal rebate scams. (¶'s 50, 51 of Kane's CC's).

The facts described in Defendants' pleadings are more than sufficient to describe the circumstances constituting fraud.  A reasonable reading of these facts could not lead to Plaintiff's conclusion that Kane has alleged no facts whatsoever that would indicate what, how or when any

fraud was committed.  Plaintiff's request for dismissal of Defendants' RICO claim under Rule 9(b) should be denied.

Should the Court wish to view matters outside of the pleadings in considering Plaintiff's Rule 9(b), then the standards of review appropriate to summary judgment apply.  Attached as Exhibit # 9 to Okoneski's Affidavit is a copy of the United States' Complaint and Affidavit In Support of Application For Arrest of Seth Lowenstein, also known as "Chaim Lowenstein". Plaintiff's fraudulent scheme is described in detail beginning at paragraph 9 therein.  Based upon this evidence alone, summary judgment against Defendants' would be no more appropriate than dismissal under Rule 9(b).

### 2.  The Claim Does Name An Enterprise Distinct from Lowenstein.

Plaintiff and his distinct business entity known as WebCom247 are identified, connected to fraudulent activities, and connected to the harm caused to Kane, Dietz-Kane and ArmorCore in paragraphs 10, 13, 42, 46, 49, 50 and 50.  These facts contained in the pleadings show that Plaintiff received income through illegal activities. Plaintiff was operating WebCom247 prior to forming ArmorCore Technologies, LLC with Kane. (¶ 10, 11, 12, and 13 of Kane's CC's). Plaintiff represented to Kane that he was a financially sound person (which presumes income) and that his financial substance came from his various businesses interests. (¶ 14 of Kane's CC's).  It has already been shown that WebCom247 was one of these businesses.  Kane started ArmorCore with Plaintiff and both invested in excess of $50,000. (¶'s 15, 16, 17, 21, 22, and 26 of Kane's CC's).  A reasonable reading of these facts would be that some or all of Plaintiff's contribution s to ArmorCore came from his various illegal activities. Also, it has been shown above that Plaintiff used ArmorCore as a conduit for his illegal rebate and mail fraud activities.

Based upon the forgoing, it is clear that the pleadings identify ArmorCore as specific enterprise and describe Plaintiff's use of ArmorCore as a conduit for racketeering. Dismissal of the RICO claims would not be appropriate.

In the alternative, neither is summary judgment appropriate because the Unites States' claims against Plaintiff clearly tie him to the illegal activities of WebCom247 (Aff. of Okoneski, Exhibit # 9,  ¶'s 12, 12, and 25), and how Plaintiff used the proceeds therefrom to use ArmorCore in his racketeering activities.

### 3.   There Is A Claim of Racketeering Conduct.

Plaintiff argues that Kane failed to allege any specific racketeering conduct [in his pleadings]. Kane's discussions immediately above show that this is not the case.  Kane has described Plaintiff's pattern of racketeering with enough sufficiency in his pleadings to avoid a dismissal of his RICO claim.

The allegation that Plaintiff identifies as "(Answer ¶ 30)" in his memorandum is misattributed.  This allegation and paragraph is from Dietz-Kane's Answer and Counterclaims, not Kane's. It may be that Dietz-Kane has not plead RICO matters with the same specificity as Kane, but Plaintiff has treated Kane and Dietz-Kane interchangeably in these proceedings and cannot reasonably be said to be surprised or uninformed of what pattern of racketeering Dietz-Kane is referring to in its RICO counterclaim against Plaintiff.

### C.  Argument That Defendants' Remaining Counterclaims Fail To Allege A Cause of Action.

The only counterclaims discussed in this section of Plaintiff's memorandum are those of Dietz-Kane as found in Counts III-V of the Answer and Counterclaims of Dietz-Kane &

associates Insurance Agency, Inc. [Docket No. 9].   There is no reference to or argument made with regard to the counterclaims Tom Kane, Jr.  Therefore, this section of Defendants' memorandum will be limited to discussing only Dietz-Kane counterclaims found at Counts III-V.

Dietz-Kane's Count III is for Exemplary and Punitive Damages. Punitive damages are a way of punishing the defendant in a civil lawsuit. They are based on the theory that the interests of society and the individual harmed can be met by imposing damages on the defendant that are additional to actual or compensatory damages.  The standard judicial formulation of the purpose of punitive damages is that it is to punish the defendant for reprehensible conduct and to deter him and others from engaging in similar conduct.  *Kemezy v. Peters*, 79 F.3d 33 (7th Cir. 1996). Dietz-Kane's Statement of Facts and the facts contained in its Counts of Slander, Racketeering, and the Count for Punitive damages are replete with examples of Plaintiff's reprehensible conduct and reckless disregard for damages his conduct has caused Dietz-Kane.

Dietz-Kane's Count IV is for actual damages. Plaintiff's racketeering activities caused Dietz-Kane actual or compensatory damages in that its staff devoted costly hours to assisting the United States in its investigation of Plaintiff's illegal activities and in assisting Kane in defending himself.  The staff was distracted from usual business activities and the production of income for Dietz-Kane as well.

Dietz-Kane's Count V is for Injunctive Relief. This Count simply alerts Plaintiff that such relief could be requested, if needed.  The Court need not dismiss or affirm injunctive relief until same is actually sought.

Punitive damages and actual damages would flow from Dietz-Kane succeeding at trial on the underlying cause of slander and racketeering.  As discussed above, these cause of action are not ripe for dismissal on the pleadings or for any other reason, so the claims for recovery of damages should survive Plaintiff's motion as well.

### D.  Plaintiff's Argument That There Is No Evidence to Support Any Of His Counterclaims.

Plaintiff's argument is made only in connection with Kane. Therefore, this section of Defendants' memorandum will not include any discussion related to Dietz-Kane.

Plaintiff argues that if judgment on the pleadings is not found by the Court to be warranted  because sufficient facts have been plead to facially support Kane's claims, then summary judgment is appropriate because Kane has produced no evidence to support his counterclaims.

In his Interrogatories Plaintiff requested the identification of documents supporting each of Kane's counterclaims.  Kane offered Plaintiff's counsel the opportunity to inspect, audit, copy or summarize all discoverable documents that are relevant to Kane's counterclaims.  This method of discovery is common where there are numerous documents to review and the burden and cost of review is the same for both parties. Plaintiff did not object to Kane's production of evidence in this manner.  The same offer to produce evidence was made when Plaintiff's counsel took Kane's deposition. (Kane. Dep. p. 39).  For whatever reason, Plaintiff's counsel simply never made arrangements to review the offered documents.  It is unfair for Plaintiff to claim that Kane has not produced any evidence outside of the pleadings to support his counterclaims when Plaintiff has avoided Kane's attempt to produce such evidence.

Because the evidence must be viewed in a manner most favorable to Kane and as if true, Kane requests that the Court adopt the facts contained in Kane's counterclaims and Dietz-Kane's counterclaims as his sworn testimony. The factual contentions contained therein are the same as they would be under oath and/or if restated in a separate Affidavit. These facts support Kane's counterclaims in the degree necessary to defeat summary judgment.

## **CONCLUSION**

Based upon the facts, authorities, and arguments stated above, Defendants respectfully request that the Court deny such relief as Plaintiff may have asked against them in his motion for judgment on the pleadings and/or summary judgment.

Respectfully submitted,

Dated: October 10, 2011

    *Thomas J. Okoneski*
Thomas J. Okoneski (# 146791)
Okoneski Law Firm LLC
P.O. Box 9069
North St. Paul, MN  55109
Telephone: (651) 260-3524
E-mail: okolaw@q.com

ATTORNEY FOR DEFENDANTS